IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:09-CV-260-WKW [WO] |
| KUMI MANUFACTURING ALABAMA, LLC, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this action against Defendant Kumi Manufacturing Alabama, LLC ("KMA"), under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, for alleged retaliation against Shawn Coleman ("Mr. Coleman") for his opposition to racially discriminatory employment practices at KMA. This cause is before the court on EEOC's partial motion for summary judgment (Docs. # 112-14), and KMA's motion for summary judgment (Docs. # 121-27). The motions have been fully briefed and are ready for disposition. Both parties have filed motions to strike evidence cited in the pending motions for summary judgment, which the court denied in an Order entered this same date.[1]

_____

[1] KMA filed a motion to strike (Doc. # 130) regarding EEOC's motion for partial summary judgment (Docs. # 112-14), to which EEOC has not replied. KMA filed a motion to strike (Doc. # 135) regarding EEOC's response in opposition to KMA's motion for summary judgment (Docs. # 131-33). EEOC then filed a motion to strike KMA's motion to strike (Doc. # 137). KMA responded with an amended motion to strike (Doc. # 138), EEOC responded in opposition (Doc. # 139), and KMA replied (Doc. # 141).

Upon careful consideration of the briefs, the relevant law, and the record as a whole, the court finds that KMA's motion for summary judgment is due to be granted.  Because KMA's motion for summary judgment is due to be granted, EEOC's motion for partial summary judgment is due to be denied as moot.[2]

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 and 1343.  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*); Fed. R. Civ. P. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the

---

[2] The court need not address EEOC's motion for partial summary judgment to decide this case. (Docs. # 112-114.)

2

nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*).  Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex Corp.*, 477 U.S. at 323.

Based on EEOC's contention that "summary judgment should be used sparingly in employment cases" (Doc. # 131 at 4 (citing *Beard v. Annis*, 730 F.3d 741, 743 (11th Cir. 1984))), the court notes that the well-settled summary judgment standard is not altered in the employment discrimination context.  Ultimately, "'trial courts should not treat discrimination differently from other ultimate questions of fact . . . ,' [therefore] the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (discussing employment discrimination review under Federal Rule of Civil Procedure 50)).[3]

---

[3] In fact, the Eleventh Circuit considered and rejected the very language EEOC relies on to advance its argument of an altered summary judgment burden in discrimination cases.  (Doc. # 131, at 4.) *See Chapman*, 229 F.3d at 1025-26 (noting that some previous Eleventh Circuit opinions "purport to announce as a general rule that summary judgment is not a proper vehicle for resolving claims of employment discrimination . . . [and] summary judgment in employment discrimination is especially questionable," but concluding that "the Supreme Court has told us that none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact.") (internal citations omitted).

4

On summary judgment, the facts must be viewed in the light most favorable to the nonmovant.  *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).  Hence, "the 'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'"  *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

### III.  FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of KMA's termination of Mr. Coleman's employment as Assistant Quality Manager in the Clanton, Alabama KMA plant on May 9, 2007.  EEOC claims Mr. Coleman was terminated in retaliation for his statutorily protected speech under Title VII, and that KMA's proffered reasons for terminating Mr. Coleman were pretextual.  The facts, construed in the light most favorable to EEOC, follow.

### A.  <u>Mr. Coleman's Employment with KMA</u>

Mr. Coleman, a black male, began his employment with KMA at the Clanton, Alabama manufacturing plant ("Clanton plant") in February 2005.  (Meeks Aff. Ex. 3; Coltrain Aff. ¶ 1.)  He was hired as a Quality Customer Service Coordinator, a first level supervisory position.  (Meeks Aff. Ex. 3; Coleman Dep. Vol. I, at 298-99.)  In May 2006, Mr. Coleman was promoted to Assistant Quality Manager.  (Meeks Aff. Ex. 5.)  As Assistant Quality Manager, Mr. Coleman was responsible for supervising two salaried employees and about twenty-one hourly employees.  (Coleman Dep. Vol. I, at 314.)  All of KMA's employees are referred to as associates, regardless of whether they are salaried or hourly.

(Meeks Aff. ¶ 4.)  The team of associates that Mr. Coleman supervised consisted of mixed genders and races.  (McDonald Aff.)

Mr. Coleman's chain of command in 2007 is relevant to EEOC's retaliation claim. Mr. Coleman's supervisor in 2007 was Jack Coltrain, the Quality Manager at KMA. (Coltrain Aff. ¶ 3, 13.)  During the relevant period, Mr. Coltrain reported to Clanton Plant Manager Matt Mignin.  (Mignin Aff. ¶¶ 3, 8.)  In addition, Debbie Meeks served as KMA's Human Resources Manager during the entirety of Mr. Coleman's employment.  (Meeks Aff. ¶ 3.)  On May 9, 2007, Mr. Coleman was terminated from his position as an Assistant Quality Manager with KMA.  (Meeks Dep. Ex. 17.)

**B.     The Alleged Statutorily Protected Activity**

EEOC cites five instances of alleged protected activity by Mr. Coleman.

### 1.     *Tony Caver Speech*

EEOC contends that Mr. Coleman's speech from January 2007 to March 2007 to his superiors about the treatment of black employee Tony Caver relative to a Hispanic employee constituted statutorily protected activity under Title VII.  (Doc. # 131, at 58.)

Mr. Caver was a black temporary employee who was not hired by KMA for full-time employment.  (Coltrain Aff. ¶ 38.)  Mr. Caver was an employee of Walker Workforce Personnel, but he worked alongside KMA full-time associates at the Clanton plant.  (Meeks Aff. ¶¶ 4-5.)  For a temporary employee to be considered for full-time employment at KMA, he had to successfully complete six weeks of work and pass the KMA General Pre-

employment Aptitude Test ("the employment test").  (Meeks Aff. ¶ 5.)   All applicants for full-time employment at KMA were required to take the employment test.  (Meeks Aff. ¶ 5.) The 2007 test was four pages long and tested reading comprehension, spelling, ability to order numbers, and math skills (multiplication, division, addition, and subtraction).  (Meeks Dep. Vol. I, at 230-31; Meeks Aff. Ex. 14.)   On one occasion, KMA allowed an unnamed applicant, who was an Hispanic non-English speaker, to take the test orally, through a translator, but ultimately that applicant was not hired.  (Meeks Aff. ¶ 43; Coleman Dep. Vol. I, at 326-30.)

Temporary employees who had worked over six weeks with KMA and passed the employment test were eligible for a full-time position at KMA, but they were not guaranteed such a position.  (Meeks Dep. Vol. I, at 230-31.)  Hiring of temporary employees for full-time employment depended on head-count approval, a Kumi North America budgeting tool that only allowed KMA to hire for budgeted vacancies.  (Meeks Dep. Vol. I, at 219.)  KMA generally preferred to hire full-time employees from its pool of temporary employees, because of their experience working at KMA, but also considered outside applicants, and at times hired outside applicants over temporary employees.  (Meeks Dep. Vol. I, at 230-35.) KMA considered temporary employees for full-time employment in the order of seniority, based on their accumulated time working at the Clanton plant.  (Meeks Dep. Vol. I, at 230-35.)

Mr. Caver worked as a temporary employee for KMA for nearly eight months, and took the employment test on two occasions, January 6, 2007, and March 16, 2007.  (Coleman

Dep. 324-25; Meeks Aff. Ex. 14.)  Mr. Caver failed the employment test on both occasions.

(Meeks Aff. Ex. 14; Coleman Dep. Vol. I, at 328.)  After failing the employment test the

second time, Mr. Caver was not hired by KMA for full-time employment and his temporary

employment at the Clanton plant ended shortly thereafter.  (Coltrain Aff. ¶ 39.)

On March 21, 2007, in response to KMA not hiring Mr. Caver, Mr. Coleman sent Ms.

Meeks and Mr. Coltrain an e-mail explaining, "I could barely get in the door this morning

before I was ambushed by associates about [Mr. Caver's] termination.  We need to meet

today and discuss this." (Coltrain Aff. Ex. 12.)  On March 22, 2007, Mr. Coltrain responded

to the e-mail, "Tony [Caver] was not terminated, he is not an employee of KMA. . . .  He

applied for a position for job [sic] for the second time and failed the pre-employment test

again." (Coltrain Aff. Ex. 12.)  Further, Mr. Coltrain explained:

> You and I have already discussed this issue, and we agreed that if he failed the test
> again that we would release his services from KMA, to keep him from thinking he
> would get hired.  So I am at a lost [sic] as to why you are requesting a meeting on this,
> since we have already agreed on the decision.

(Coltrain Aff. Ex. 12.)  Mr. Coleman replied, explaining his request for a meeting: "I think

[Ms. Meeks] needs to hear what the people are saying on the floor.  What you and I agreed

upon was that we would show common courtesy and give this man a few weeks to find a job

in the event that he did fail again.  Yes, I still want to meet with both of you about this."

(Coltrain Aff. Ex. 12.)  Indeed, they met.

At that March 22, 2007 meeting, Mr. Coleman, Mr. Coltrain, and Ms. Meeks reviewed

Mr. Caver's employment test scores.  (Coleman Dep. Vol. I, at 326, 340)  Upon review of

Mr. Caver's test scores, Mr. Coleman recognized that Mr. Caver had failed the test. (Coleman Dep. Vol. I, at 326.)  Then Mr. Coleman asked Ms. Meeks, "[W]as there any other form of testing that we could give [Mr. Caver?]  Can we modify the test, is there anything that we can do for him[?]"  (Coleman Dep. Vol I., at 326-27.)  Ms. Meeks replied, "No, there wasn't anything we could do for him."  (Coleman Dep. Vol. I, at 327.)

Mr. Coleman then raised the issue, "Could we modify [the employment test] and give [Mr. Caver] an oral test?"  (Coleman Dep. Vol. I, at 328.)  Mr. Coleman said, "We modify tests for other people because I know when . . . Hispanics aren't able to read English well, you allow another Hispanic to read the test to [him or her]."  (Coleman Dep. Vol. I, at 327.)  Ms. Meeks responded, "Well, yeah, we do do that, but it's different.  That's just a reading issue."  (Coleman Dep. Vol. I, at 327.)  She also explained that Mr. Caver was a United States citizen and had a high school diploma.  (Meeks Dep. Vol I, at 70; Meeks Aff. ¶ 43.)  Mr. Coleman then replied, "It shouldn't be any different.  It's still a modification.  You modified it for Hispanics, but a modification is a modification."  (Coleman Dep. Vol. I, at 327.)  In response to a question by KMA's counsel of what an English language modification had to do with the fact that Mr. Caver is African-American, Mr. Coleman explained, "That's a different race. . . .  You asked what did it have to do with race.  She was modifying for one race and she didn't modify for another."  (Coleman Dep. Vol. I, at 327-28.)

Also at that meeting, Mr. Coleman told Mr. Coltrain and Ms. Meeks that black employees "wanted to know what is this [employment] test."[4] (Coleman Dep. Vol. I, at 351.) Further, Mr. Coleman explained that "[the associates] felt that Tony [Caver] had worked here all this time. He should have been hired." (Coleman Dep. Vol. I, at 352.) Mr. Coleman identified one source for these complaints, Carolyn Myrick, and it was her concerns that he passed along to Ms. Meeks. (Coleman Dep. Vol. I, at 350-51.) Accordingly, Mr. Coleman relayed to Ms. Meeks that Ms. Myrick "wanted to say that [Mr. Caver] wasn't hired because he was black. And what is this test. They created this test[?] I never took this test." (Coleman Dep. Vol. I, at 351.) In its "Additional Material Facts" section, EEOC claims that

---

[4] KMA objects to this testimony in this paragraph on the grounds that it is hearsay, offered to prove that other associates thought the test was unfair and discriminatory, and Mr. Caver was not hired because he was black. (Doc. # 135, at 6; Doc. # 136, at 7.) EEOC contends that the statement is not offered for the truth of the matter asserted, but rather "to establish that Coleman engaged in protected activity when he relayed the Black associates' position that the hiring test was unfair, and that Defendant was aware of his protected activity." (Doc. # 139, at 6.) This evidence presents a double-hearsay problem, so the court must look to the admissibility of each part of the combined statements. Fed. R. Evid. 805. The evidence is admissible as to its effect on the listeners of Mr. Coleman's opposition to racial discrimination. 30B Michael H. Graham, Federal Practice & Procedure § 7005 (2006) ("[W]hen the mere making of the statement is the relevant fact, i.e., tends to establish a fact of consequence, Rule 401, hearsay is not involved. Such statements are frequently said to be offered solely for the fact said and not for the truth of the matter asserted, i.e., the truth of their contents."). The statements are also admissible as accounts of Mr. Coleman's state of mind. *Brown v. Metro. Atl. Rapid Trans. Auth.*, 261 F. App'x 167, 174 n.9 (11th Cir. 2008).

Carolyn Myrick's speech and the speech of unknown "black associates" are not admissible, however, to prove the existence of racial discrimination, that the employment test was discriminatory or unfair, or that Mr. Caver should have been hired. Fed. R. Evid. 801(c); *United States v. Schlei*, 122 F.3d 944, 981 (11th Cir. 1997). Any of those uses would require the court to assume the truth of Ms. Myrick's out-of-court statement: that black people were discriminated against, that the test was unfair and discriminatory, or that Mr. Caver should have been hired. Though EEOC has not argued under Fed. R. Evid. 801(d)(2)(D), the court further finds that Ms. Myrick's speech was beyond the scope of her employment as an hourly employee with no role in hiring and firing, and thus not an admission of a party opponent. *Miles v. M.N.C. Corp.*, 750 F.2d 867, 874-75 (11th Cir. 1985). Nor can the court construe Ms. Myrick's speech as opposition under Title VII, because there is no evidence in the record to support her personal knowledge or subjective belief of the matter asserted, nor is she or EEOC claiming she was retaliated against for her speech.

"Mr. Coleman also relayed that many black associates felt that the test was unfair and was only implemented to screen blacks out of permanent positions with [KMA]."  (Doc. # 131, at 43 (citing Coleman Dep. Vol. I, at 349-50).)  The facts in the record cited by EEOC do not support such a broad assertion, and only show that Mr. Coleman passed along the concerns of one black associate, Ms. Myrick.  (Coleman Dep. Vol. I, at 349-51 (Mr. Coleman only identified the complaint of one associate, Ms. Myrick).)

### 2.   *Union Avoidance Campaign and Racial Profiling Speech*

EEOC contends that Mr. Coleman's speech to Ms. Meeks and Marcel Debruge, an attorney for KMA, in a meeting in February 2007 about KMA's potential use of union avoidance efforts for racial profiling constituted statutorily protected activity under Title VII. (Doc. # 131, at 58.)

During February 2007, KMA held a series of meetings among management, and also between management and hourly associates to discuss efforts to prevent a union from organizing at KMA.  (Meeks Aff. ¶¶ 18-24.)  In one of those meetings, Ms. Meeks, Mr. Debruge and another attorney from Burr & Forman, met with Mr. Coleman and two salaried associates from the Quality Department, Micah McDonald and Barbara Ray, to discuss feedback received from hourly associates about the United Auto Workers efforts to unionize the Clanton plant. (Meeks Aff. ¶ 20-22; Coleman Dep. Vol. II, at 35.)  At that meeting, Mr. Coleman made a statement to Ms. Meeks and Mr. Debruge that he felt that KMA's union avoidance campaign constituted racial profiling and discrimination.  (Coleman Dep. Vol. I, at 361-62.)  Mr. Coleman expressed his concerns that "based on what [he] found[,] that

African-Americans are . . . the most likely race to unionize, that [he] felt that tactics that would be used by the unionizing company was [sic] racial profiling and discrimination." (Coleman Dep. Vol. I, at 362; Meeks Aff. ¶¶ 22-23.)  The basis for Mr. Coleman's belief that a union avoidance campaign would constitute racial profiling was that "if [KMA's] tactics are to eliminate the people that's [sic] more likely to vote for a union, that would be African-Americans."  (Coleman Dep. Vol. I, at 366.)  Mr. Coleman had done internet research, and based on statistics he found, he believed that blacks were more likely to join a union than whites.  (Coleman Dep. Vol. I, at 365; Meeks Aff. ¶ 23.)  Therefore, Mr. Coleman believed that through the union avoidance campaign, KMA was more likely to fire blacks than it was to fire whites.  (Coleman Dep. Vol. I, at 371.)  In response to his concerns, Ms. Meeks or Mr. Debruge told Mr. Coleman that none of the information gained from supervisors about employees' potential interest in unions would be used to terminate employees.  (Coleman Dep. Vol. I, at 417; Coleman Dep. Vol. I Ex. 12.)

### 3.  *Favoritism Speech*

EEOC contends that Mr. Coleman's speech in the union avoidance meeting in February 2007 that associates were disgruntled because of disparate treatment by Mr. Coltrain constituted statutorily protected activity under Title VII.  (Doc. # 131, at 58.)  At the same meeting where he raised the issue of union avoidance and racial profiling, Mr. Coleman was asked by Mr. Debruge, "Why are your employees in [the quality department] so disgruntled?"  (Coleman Dep. Vol. II, at 39.)  In response, Mr. Coleman stated that "[the department's employees] thought that Jack [Coltrain] showed favoritism in discipline[ and]

favoritism in promoting." (Coleman Dep. Vol. II, at 39.) Mr. Coleman did not recall tying

his comments concerning Mr. Coltrain's alleged favoritism to race, however. (Coleman Dep.

Vol. I, at 362-63; Coleman Dep. Vol. II, at 137-38.) Nor did Ms. Meeks recall any speech

from Mr. Coleman about racial discrimination by Mr. Coltrain. (Meeks Aff. ¶ 46.)

### 4. *Racial Discrimination at a Previous Employer Speech*

EEOC contends that Mr. Coleman's speech in the union avoidance meeting in

February 2007 that he had been a victim of racial discrimination by a previous employer

constituted statutorily protected activity under Title VII. (Doc. # 131, at 58.)

At the union avoidance meeting in February 2007, Mr. Coleman told Ms. Meeks and

Mr. Debruge that "[he] had been a victim of discrimination at a former employer." (Coleman

Dep. Vol. II, at 41.) Mr. Debruge then asked who that employer was, and Mr. Coleman

responded, "Ogihara." (Coleman Dep. Vol. II, at 41.) Mr. Coleman was employed by

Ogihara America from February 1999, until October 2001. (Coleman Dep. Vol. I Ex. 23.)

### 5. *Black Supervisor Speech*

EEOC contends that Mr. Coleman's complaint regarding KMA's discriminatory

treatment of a black supervisor constituted statutorily protected activity under Title VII.

(Doc. # 131, at 30.)

The evidence cited by EEOC for such speech, however, makes no mention of any

complaint by Mr. Coleman concerning a black supervisor. (Doc. # 131, at 30 n.51; Coleman

Dep. Vol. I, at 20-26.) In the line of questioning cited by EEOC, Mr. Coleman was asked

twice if he remembered any other complaints of racial discrimination or other statutorily

protected activity which led to his retaliation.  (Coleman Dep. Vol. I, at 20-26.)  In response to both questions, he said he did not recall having made any other complaints.  (Coleman Dep. Vol. I, at 20-26.)  The court also notes that EEOC makes no mention of Mr. Coleman's complaint regarding discrimination against a black supervisor in the section of its response brief entitled: "Mr. Coleman['s] Protected Activities."  (Doc. # 131, at 58.)  The court has reviewed no other evidence in the record showing that Mr. Coleman made a complaint to his employer concerning an unlawful employment activity under Title VII directed at a black supervisor.

### C.   KMA's Proffered Reasons for Terminating Mr. Coleman

On May 8, 2007, Mr. Coleman told his supervisor, Mr. Coltrain, that he would work the night shift on May 9, 2007, because of some appointments he had to attend that day. (Coltrain Aff. ¶ 29.)  Mr. Coltrain did not give him approval for this shift change.  (Coltrain Aff. ¶ 29.)  At 4:44 p.m. on May 8, 2007, Mr. Coleman sent Mr. Coltrain an e-mail stating, "Jack, I was serious about changing my shift probably for the remainder of the week. . . . I will work from 8pm–4:30am."  (Coltrain Dep. Ex. 13.)  Upon receipt of that e-mail on May 8, 2007, Mr. Coltrain took the e-mail to Ms. Meeks's office and recommended Mr. Coleman's termination because he had not given his approval for the shift change and he considered Mr. Coleman's e-mail to be a unilateral change that was undermining and insubordinate.  (Coltrain Aff. ¶¶ 29-30, 32; Meeks Aff. ¶¶ 36, 37.)

On May 9, 2007, Mr. Coleman arrived at work at 8:00 p.m., pursuant to his e-mail to Mr. Coltrain advising his supervisor of his shift change.  (Coltrain Aff. ¶ 34; Coltrain Dep.

Ex. 13.)  Upon his arrival, Mr. Coleman was brought to the Human Resources office by Mr. Coltrain for a meeting with Ms. Meeks.  (Coltrain Dep. Vol. II, at 158.)  At that meeting, Mr. Coltrain told Mr. Coleman that he was being terminated on the grounds of absenteeism, undermining a superior, showing  disloyalty, and lack of dedication toward the company. (Coleman Dep. Vol. I, at 399-400; Coleman Dep. Vol. I Ex. 12, at 1; Doc. # 131, at 27.)  The decision to terminate Mr. Coleman was made by Ms. Meeks, in conjunction with Mr. Coltrain.  (Meeks Dep. Vol. II, at 135-36.)  According to the KMA Employee Change Authorization form filled out that day, Mr. Coleman was terminated for "Attendance [and] Job Performance."  (Meeks Dep. Ex. 17.)

## IV.  DISCUSSION

KMA contends summary judgment is appropriate because EEOC has not produced sufficient evidence to raise a genuine issue of material fact on its prima facie retaliation claim or that Mr. Coleman's termination was pretextual.  (Doc. # 122, at 21.)  EEOC contends that summary judgment should be denied because there are genuine issues of material fact regarding every element of its retaliation claim.  (Doc. # 131, at 1.)  For the following reasons, EEOC has failed to raise a genuine issue of material fact that Mr. Coleman engaged in statutorily protected activity necessary to state a retaliation claim under  Title VII.

## A.    **Title VII Retaliation Standard**

"The burden of proof in Title VII retaliation cases is governed by the framework established in *McDonnell Douglas Corp. v. Green*."  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993) (*citing McDonnell Douglas v. Green*, 411 U.S. 792 (1973)).

To establish a claim under Title VII, a plaintiff must prove that (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there was some causal relation between the two events.  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  After the plaintiff has established the elements of the prima facie case, the employer has an opportunity to articulate a legitimate nonretaliatory reason for the challenged employment action.  *Id.*  Ultimately, the plaintiff bears the burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer was pretextual.  *Id.*

**B.**     **EEOC Has Not Raised a Genuine Issue of Material Fact that Mr. Coleman Engaged in Statutorily Protected Activity**

KMA contends that EEOC has not produced sufficient evidence to create a genuine issue of material fact that Mr. Coleman engaged in statutorily protected activity under Title VII.[5]  (Doc. # 122, at 21-24; Doc. # 136, at 17-22.)

**1.**     ***Standard for a Retaliation Claim Under the Opposition Clause***

Title VII prohibits discrimination against any employee because he (1) "has opposed any practice made an unlawful employment practice by this subchapter" (opposition clause), or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (participation clause). 42 U.S.C. § 2000e-3(a).  EEOC brings its claim under the opposition clause only.  For a plaintiff to

---

[5] KMA does not dispute that Mr. Coleman's termination creates a genuine issue of material fact on element (2), a materially adverse action.  (Doc. # 122, at 21.)

meet its burden of showing statutorily protected activity under Title VII's opposition clause, it must show that the employee engaged in (1) opposition of an unlawful employment practice under Title VII or (2) opposition of an employer's conduct which is actually *lawful* under Title VII, but that he had "a good faith, reasonable belief that the employer was engaged in unlawful employment practices [under Title VII]."  42 U.S.C. § 2000e-3(a)*; Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997))*; see also Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008).

### a.  Opposition under Title VII

In *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee*, the Supreme Court recently considered what constitutes opposition in the context of a Title VII retaliation claim.  129 S. Ct. 846 (2009).  The Supreme Court held that an employee's speech about sexually harassing behavior to a company human resources officer in response to an employer's internal investigation constituted opposition under the Title VII retaliation framework.  *Id.* at 850-51.  The Court explained that, "the term 'oppose,' being left undefined by the statute, carries its ordinary meaning: 'to resist or antagonize . . . , to contend against; to confront; resist; withstand[.]'" *Crawford*, 129 S. Ct. at 851 (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979) (quoting Webster's New International Dictionary 1710 (2d ed. 1958))).  The Court then held that the plaintiff's description to a company human resources officer of a fellow employee's sexually harassing behavior, including crotch grabbing, "put[ting] his crotch up to her window," and "grabb[ing] her head and pull[ing] it

17

to his crotch," constituted "an ostensibly disapproving account of sexually obnoxious behavior toward her by a fellow employee, . . . [and] thus [was] covered by the opposition clause." *Id.* at 849-50. Even though the plaintiff's speech was given in response to an employer's question, it constituted opposition just as conduct, such as "standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons," may constitute opposition. *Id.* at 851.

### b.   *An Unlawful Employment Practice under Title VII*

To establish an opposition claim under Title VII, a plaintiff must also show "that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Butler*, 536 F.3d at 1213 (quoting *Little*, 103 F.3d at 960). The plaintiff's burden includes both a subjective and an objective component. *Id.* "A plaintiff must . . . show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices." *Id.* Further, the plaintiff must show "that his belief was *objectively* reasonable in light of the facts and record presented." *Id.*

If the facts, record, and pertinent law show that the employee's subjective belief was in good faith and that his employer was engaged in an actually unlawful employment practice under Title VII, the plaintiff has made his prima facie case under the first element. *Butler*, 546 F.3d 1213-14. However, "a plaintiff can [also] prevail on a retaliation claim based on opposition to an employment practice that is not actually unlawful." *Id.* at 1214. In these situations, "[the court] must consider the controlling substantive law in [the Eleventh Circuit] when [assessing] whether a plaintiff's mistaken belief is objectively reasonable." *Id.* (citing

*Harper*, 139 F.3d at 1388 & n.2).  While a Title VII retaliation plaintiff "need not prove the underlying claim of discrimination which led to [his] protest," he still bears the burden to show that his belief was objectively reasonable, as measured against existing substantive law. *Muhammad v. Audio Visual Servs. Group*, 280 F. App'x 864, 872 (11th Cir. 2010) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)). "Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of [the Eleventh Circuit] or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Id.*

### 2.     EEOC Has Not Produced Sufficient Evidence to Show that Mr. Coleman Engaged in Statutorily Protected Activity

Examination of the evidence supporting EEOC's allegations of Mr. Coleman's statutorily protected activity shows that it has not satisfied its burden of creating a genuine issue of material fact on the first prima facie element of a Title VII retaliation claim.

#### a.     Tony Caver Speech

EEOC has failed to carry its burden to show that there is a genuine issue of material fact that Mr. Coleman engaged in statutorily protected activity when he spoke concerning KMA's decision not to offer Mr. Caver an oral employment test accommodation.[6]

---

[6] The court acknowledges that EEOC has produced sufficient evidence for a reasonable jury to find that Mr. Coleman spoke in opposition, *i.e.,* to resist or to confront a perceived unlawful employment practice, and that he subjectively believed, in good faith, that the oral employment test accommodation constituted an unlawful employment practice.  (Coleman Dep. 326-28.)  Such a determination, however, is not necessary to deciding this case on summary judgment.  *See Celotex*, 477 U.S. at 322-23 ("A

Despite evidence of Mr. Coleman's subjective belief that the language accommodation was unlawful, his belief was not objectively reasonable.  EEOC argues that "Mr. Coleman engaged in the protected activit[y]" by "complaining about [KMA's] treatment of Mr. Caver in relation to Hispanic applicants."  (Doc. # 131, at 58.)  EEOC's argument fails, however, because "the allegations and record must also indicate that the belief [that the employer was engaged in unlawful employment practices under Title VII], though perhaps mistaken, was objectively reasonable."  *Butler*, 536 F.3d at 1213.

It is not an unlawful employment practice under Title VII "for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results[,] is not designed, intended or used to discriminate because of race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(h). Furthermore, the Supreme Court has recently noted that objective "employment tests can be an important part of a neutral selection system that safeguards against the very racial animosities Title VII was intended to prevent." *Ricci v. Destefano*, 129 S. Ct. 2658, 2676 (2009); *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1178 (11th Cir. 2010). "In other words, such tests may help fulfill the purpose of Title VII, which is to promote hiring on the basis of job qualifications, rather than on the basis of race or color." *Brown*, 597 F.3d at 1178 (internal quotations omitted).  KMA produced evidence that its conduct was lawful. *All* temporary employees, regardless of any protected status, were considered for full-time

---

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

employment after successfully completing six weeks of work at KMA and passing the employment aptitude test. (Meeks Aff. ¶ 5.)

The only conduct in the record supporting Mr. Coleman's belief that the testing accommodation was unlawful is that someone of a different race than Mr. Caver was given an oral testing accommodation to take the employment test. Based on that conduct, the objective reasonableness of Mr. Coleman's belief is at issue. Under both a Title VII disparate treatment and disparate impact analysis, binding precedent squarely holds that KMA's testing accommodation was not unlawful.

> ### i.     Not an Objectively Reasonable Belief under a Title VII Disparate Treatment Analysis

Title VII's principal nondiscrimination provision, 42 U.S.C. § 2000e-2(a)(1), holds employers liable for disparate treatment. *See Ricci*, 129 S. Ct. at 2672. A disparate treatment claim under Title VII "occurs where an employer 'has treated [a] particular person less favorably than others because of' a protected trait." *Ricci,* 129 S. Ct. at 2672 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985-86 (1988)). "A disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." *Ricci*, 129 S. Ct. at 2672 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985-86 (1988)). A prima facie case of race discrimination may be established in two ways: (1) by presenting direct evidence of discrimination or (2) by presenting circumstantial evidence using a variation of the four-part test delineated in *McDonnell Douglas Corp. v. Green. See* 411 U.S. at 792; *see also Damon v. Fleming Supermarkets of*

21

*Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999).  The court need not look beyond the elements of a prima facie discrimination case to determine that Mr. Coleman's belief was not objectively reasonable in light of Eleventh Circuit precedent, under either a direct evidence or circumstantial evidence analysis.

### aa.    Not an Objectively Reasonable Belief Based on Direct Evidence of Discrimination

Mr. Coleman's belief was not based on any conduct by KMA that constitutes direct evidence of racial discrimination under Eleventh Circuit precedent.  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346,1351-52 (11th Cir. 1999).  Direct evidence of discrimination is "'evidence that, if believed, proves [the] existence of [a] fact in issue without inference or presumption.'"  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)). "'[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'"  *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 639 (11th Cir 1998) (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)).  The evidence must show "that the complained-of employment decision was *motivated* by the decision-maker's [racism]."  *Damon*, 196 F.3d at 1358-59.  Thus, "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race]' will constitute direct evidence of discrimination."  *Id.* at 1359 (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990)).  Ms. Meeks's response, "That's just a

reading issue," in response to Mr. Coleman's request for an oral testing accommodation for Mr. Caver grossly misses the direct evidence mark.  Absent an inference, it proves no relevant fact.  *Clover*, 176 F.3d at 1352; (Coleman Dep Vol. I, at 327 (Ms. Meeks stated "well, yeah, we do [provide an oral testing accommodation for non-English speaking applicants], but it's different.  That's just a reading issue.").)  Nor has EEOC provided any other direct evidence of racial discrimination.

### bb.    Not an Objectively Reasonable Belief Based on Circumstantial Evidence of Discrimination

Similarly, Mr. Coleman's belief was not based on any conduct by KMA that constitutes circumstantial evidence of racial discrimination under Eleventh Circuit precedent, and therefore his belief was not objectively reasonable.  *Clover*, 176 F.3d at 1351-52.

A plaintiff may rely on circumstantial evidence to establish a prima facie case of discrimination.  *Holifield*, 115 F.3d at 1561-62.  When relying on circumstantial evidence to support his claim, a plaintiff may demonstrate a prima facie case of discrimination by showing that: "(1) he belongs to a [protected class]; (2) he was subjected to [an] adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job."  *Id.* at 1562.  "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects."  *Id.*  If a plaintiff cannot identify a similarly situated comparator who was treated more favorably than himself, then "summary judgment is appropriate where no other evidence of discrimination is present."

*Id.* "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Id.*

Despite this non-onerous burden, EEOC's claim fails because EEOC has provided no evidence of a similarly situated employee outside of Mr. Caver's classification who was treated more favorably than Mr. Caver. Nor is any other evidence of discrimination present. All the evidence shows is that a non-English speaking Hispanic applicant was given an oral testing accommodation not given to an English speaking black applicant. The unnamed Hispanic applicant was not similarly situated to Mr. Caver; he did not speak English. The absence of evidence of an adequate comparator alone dooms Mr. Coleman's belief as objectively unreasonable. *See Muhammad v. Audi Visual Servs. Grp.*, 380 F. App'x 864, 873 (11th Cir. 2010) (The plaintiff's belief of racial discrimination was objectively unreasonable in the absence of a similarly situated comparator.). Notwithstanding this fatal flaw, Mr. Coleman's belief also fails because the evidence shows Mr. Caver was actually treated more favorably than other potential comparators; he was allowed to take the employment test a second time. (Coltrain Dep. Vol. I, at 81-82.) Mr. Coleman did not hold an objectively reasonable belief that KMA had engaged in racial discrimination by disparate treatment of Mr. Caver.

### ii. *Not an Objectively Reasonable Belief under a Title VII Disparate Impact Analysis*

Finally, EEOC has failed to show that Mr. Coleman objectively believed that the employment test had a disparate impact on grounds protected under Title VII. *See* 42 U.S.C.

§ 2000e-2(k)(1)(A)(I). Any such belief by Mr. Coleman could not be objectively reasonable because the evidence in the record shows that both applicants, Mr. Caver and the unnamed Hispanic applicant, were *not* hired by KMA. There is simply no evidence the employment test had a disparate impact. *See Ricci*, 129 S. Ct. 2658 (citing 42 U.S.C. § 2000e-2(k)(1)(A)(I)) (Under the disparate impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin."). Any belief by Mr. Coleman to the contrary is objectively unreasonable.

### b. Union Avoidance Campaign and Racial Profiling Speech

EEOC has failed to carry its burden to show that there is a genuine issue of material fact that Mr. Coleman engaged in statutorily protected activity when he spoke concerning his belief that union avoidance tactics by KMA could constitute racial profiling and discrimination.

EEOC has failed to produce evidence to support the objective reasonableness of Mr. Coleman's belief that KMA's potential use of tactics to eliminate the employees most likely to vote for the union would constitute racial profiling or discrimination. Mr. Coleman believed that KMA's union avoidance campaign would constitute racial profiling because "*if* [KMA's] tactics are to eliminate the people that's [sic] more likely to vote for a union, that would be African-Americans." (Coleman Dep. Vol. I, at 366.) Mr. Coleman's belief was premised on his own internet research and statistics he located stating that blacks were more likely to join unions than whites. (Coleman Dep. Vol. I, at 365.) Mr. Coleman also

conceded at his deposition, however, that in 2007, a higher percentage of white workers were unionized than black workers in the United States.  (Coleman Dep. Vol. I, at 366.)  This admission raises serious doubts about whether EEOC can satisfy its burden to show a genuine issue of material fact on the subjective reasonableness of Mr. Coleman's belief, but the court need not decide that issue because no reasonable fact finder could find Mr. Coleman's belief to be objectively reasonable.  *See Butler*, 536 F.3d at 1213.

First, an employer's union avoidance campaign alone is not an unlawful employment practice under Title VII.  It is not unlawful under the National Labor Relations Act for management to express its views on unions, so long as the expression of that opinion is "not coercive, does not contain threats of reprisal or force, or does not promise benefits." 29 U.S.C. § 158(c); *N.L.R.B. v. Lampi, LLC*, 240 F.3d 931, 936 (11th Cir. 2001).  The legality of the union avoidance campaign itself is not at issue here.

EEOC's argument is merely that "Mr. Coleman engaged in the protected activit[y], including complaining about . . . racial profiling of Black hourly-associates during the union effort."  (Doc. # 131, at 58.)  The problem with this conclusory argument is that Mr. Coleman did not oppose any actual conduct by KMA.  What counts for opposition clause analysis is "only the conduct that [the] person opposed, which cannot be more than what [he] was aware of.  Additional conduct or allegations unknown to the opposing person are not relevant to the opposition clause inquiry."  *Clover*, 176 F.3d at 1352.  Mr. Coleman's belief that *if* KMA used union avoidance tactics to terminate employees, such activity would be unlawful under Title VII is not an objectively reasonable belief of discriminatory conduct.  He stated his

26

opposition in terms of a hypothetical, "It *would* be discrimination to fire people because –

*if* the way your tactics are, *if* you're going to get rid of the people [who are] most likely to

vote for a union, that *would* adversely affect African-Americans." (Coleman Dep. Vol. I, at

371.)   In response, he was told explicitly that none of the information gained from

supervisors about employees' potential interest in unions would be used to terminate

employees.   (Coleman Dep. Vol. I, at 417; Coleman Dep. Vol. I Ex. 12.)   Posing a

hypothetical to one's supervisors is not opposition to an employment practice cognizable

under Title VII retaliation.

Mr. Coleman's testimony that three black employees, Janet Lanier, Lamar Gaston, and

Robert Thompson, were terminated because of their union activity fails to raise a genuine

issue of material fact.  (Coleman Dep. Vol. I, at 367-69.)  All three of these employees were

terminated long after Mr. Coleman's speech about racial profiling, and in fact after Mr.

Coleman himself was terminated from KMA.[7]  *Clover*, 176 F.3d at 1352; (Meeks Aff. ¶ 25.)

These terminations cannot be conduct actually opposed by Mr. Coleman when he expressed

concerns about the potential for racial profiling in February 2007.

EEOC does not point to any evidence of other KMA conduct which Mr. Coleman

opposed during this speech, nor has the court discerned any from the record.  There is simply

no evidence of anything resembling actual conduct by KMA involving protected status

---

[7] Janet Lanier was terminated in late 2007.  (Meeks Aff. ¶ 25 (Ms. Meeks states that Ms. Lanier voluntarily resigned, but because Mr. Coleman contends she was constructively terminated (Coleman Dep. Vol. I, at 268), the court views that fact in the light most favorable to EEOC).)  Lamar Gaston and Robert Thompson were both terminated in early 2008.  (Meeks Aff. ¶ 25.)

employees that occurred and that Mr. Coleman was aware of at the time of his speech. *Clover*, 176 F.3d at 1351-52.  Without actual conduct and Mr. Coleman's knowledge of such conduct, there can be no racial discrimination to oppose, and therefore Mr. Coleman's belief is not objectively reasonable.

### c.   *Favoritism Speech*

EEOC has failed to show that there is a genuine issue of material fact that Mr. Coleman engaged in statutorily protected activity when he allegedly complained about mistreatment of black associates by Mr. Coltrain.   In fact, EEOC has not produced any evidence that Mr. Coleman complained about an unlawful employment practice under Title VII when he spoke about Mr. Coltrain's treatment of associates.

EEOC alleges that Mr. Coleman opposed "mistreatment of [b]lack hourly associates by [Mr.] Coltrain."  (Doc. # 131, at 58.)  The record evidence cited by EEOC to support this allegation, however, shows that Mr. Coleman made no such mention of race to Ms. Meeks or Mr. Debruge.  (Doc. # 131, at 29.)[8]  In fact, Mr. Coleman himself admitted that he did not recall tying his speech concerning Mr. Coltrain's favoritism to race or racial discrimination. (Coleman Dep. Vol. I, at 362-63; Coleman Dep. Vol. II, at 137-38.)  Nor did Ms. Meeks

---

[8] EEOC cites Coleman Dep. Vol. II, at 39 (At the meeting, Mr. Coleman discussed disgruntled Quality Department associates and Mr. Coltrain's favoritism, but made no mention of race, discrimination or other practices unlawful under Title VII) and Coleman Dep. Vol. II at 215-18 (Mr. Coleman testified that he believed that Mr. Coltrain on at least two occasions favored white employees over black employees, but made no mention of discussing these incidents with Ms. Meeks and Mr. Debruge at the meeting).

recall any such speech from Mr. Coleman about race or racial discrimination involving Mr. Coltrain.  (Meeks Aff. ¶ 46.)

Mr. Coleman's complaint concerning Mr. Coltrain's favoritism, which made no mention or allegation of racial discrimination, fails to create a genuine issue of material fact that his speech constituted statutorily protected activity.  Opposition requires conduct or words that resist, confront, or contend against "any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a); *Crawford*, 129 S. Ct. at 850.  Based on the evidence in the record, no reasonable juror could find that Mr. Coleman's speech concerning Mr. Coltrain's alleged favoritism was statutorily protected opposition under Title VII.  "Even after *Crawford*, to engage in protected activity, the employee must still, 'at the very least, communicate her belief that discrimination is occurring to the employer,' and cannot rely on the employer to 'infer that discrimination has occurred.'" *Demers v. Adams Homes of Nw. Florida, Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (quoting *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998)); *see also Birdyshaw v. Dillard's, Inc.*, 308 F. App'x 431, 436-37 (11th Cir. 2009) (holding that employee's complaint, even assuming it constituted opposition, was not directed at "any employment practice made unlawful under Title VII because she referred only to age, which is not a protected ground under the statute").  Mr. Coleman's speech about Mr. Coltrain's favoritism is nothing more than a complaint about unfair treatment.  "Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice

under Title VII." *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).

### d.      *Racial Discrimination at a Previous Employer Speech*

EEOC has failed to carry its burden to show that there is a genuine issue of material fact that Mr. Coleman engaged in statutorily protected activity when he complained that he had been a victim of racial discrimination by a previous employer.  EEOC alleges "that Mr. Coleman engaged in the protected activt[y], including complaining about . . . the fact that, he too, had been a victim of racial discrimination."  (Doc. # 131, at 58.)  The basis for this allegation is Mr. Coleman's speech at the February 2007 union avoidance meeting, to Ms. Meeks and Mr. Debruge, that he had been a victim of discrimination at Ogihara, a former employer.  (Coleman Dep. Vol. II, at 41.)

Mr. Coleman's complaint of racial discrimination by a former employer, made to his then-current employer, is not opposition to an unlawful employment practice protected by Title VII's opposition clause.  42 U.S.C. § 2000-e(3)(a) states that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has *opposed any practice made an unlawful employment practice by this subchapter*." (emphasis added).  The statute's language concerning an unlawful employment practice is seemingly broad in scope, but the controlling case law is not.  To state a prima facie case of retaliation under the opposition clause, a plaintiff must show that "he had a good faith, reasonable belief that *the* employer was engaged in unlawful employment practices.  . . . [meaning] he subjectively believed *his* employer was engaged

in unlawful employment practices [and] . . . that his belief was objectively reasonable in light of the facts and record presented." *Butler*, 536 F.3d at 1213 (quoting *Little*, 103 F.3d at 960) (emphasis added).

Stating to one's current employer that he or she was discriminated against by a previous employer, without more, is not statutorily protected activity under Title VII. To suggest otherwise would undermine the purpose of Title VII. "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses. 'Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances.'" *Burlington N. & Santa Fe Ry. v White*, 548 U.S. 53, 67 (2006) (citing *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)). There is no evidence that Mr. Coleman filed a charge or suit against Ogihara or that Ogihara had acted in any way to negatively affect his employment with KMA, *e.g.,* a negative job reference. The EEOC's own Compliance Manual lists a definition of opposition that clearly contradicts the "any employer" definition EEOC implicitly argues the court adopt in this case. "[The anti-retaliation] protection applies if an individual explicitly or implicitly communicates to *his or her* employer . . . a belief that *its* activity constitutes a form of employment discrimination . . . ." 2 EEOC Compliance Manual § 8-II-B(1) (June 2006) (defining elements of a retaliation claim) (emphasis added).[9]

---

[9] The Supreme Court also cited with approval an EEOC guideline that itself limits opposition under Title VII to an employment practice committed by the employee's actual employer. "'When an employee communicates to *her* employer a belief that *the* employer has engaged in . . . a form of employment discrimination, that communication,' virtually always 'constitutes the employee's opposition to the activity.'" *Crawford*, 129 S. Ct. at 851 (citing 2 EEOC Compliance Manual §§ 8-II-B(1), (2), p.

### e.     *Black Supervisor Speech*

EEOC has failed to carry its burden to show that there is a genuine issue of material fact that Mr. Coleman engaged in statutorily protected activity when he allegedly complained to his superiors in opposition to KMA's discriminatory treatment of a black supervisor. (Doc. # 131, at 30.)[10]  EEOC's claim fails because it has not produced any evidence to show that Mr. Coleman ever made such speech to his employer.  The evidence cited by EEOC for this claim does not show that Mr. Coleman made any mention of or complaint about unlawful employment practices directed at a black supervisor by KMA.  (Doc. # 131, at 30 (citing Coleman Dep. Vol. I, at 20-26).)  EEOC has failed to cite any particular parts of the record that provide evidence of opposition to an unlawful employment practice under Title VII, nor has the court reviewed any.  *See* Fed. R. Civ. P. 56(c)(1) & (3).  Therefore, EEOC's fifth and final instance of alleged protected speech also fails.

## V.  CONCLUSION

EEOC has failed to establish a genuine issue of material fact that Mr. Coleman's belief that KMA was engaged in unlawful racial discrimination was objectively reasonable. Because Mr. Coleman's belief must have been objectively reasonable to establish statutorily

---

614:003 (Mar. 2003)) (emphasis added).

[10] The EEOC does not mention this incident in its argument titled "Mr. Coleman's Protected Activities," but because EEOC makes similar reference to such speech in its "Response to Defendant's Undisputed Facts" section, the court analyzes it as part of the prima facie case.  (Doc. # 131, at 30, 58.) Based on a review of the briefs, the court can only surmise that the black supervisor in question is Micah McDonald, but that does nothing to advance EEOC's claim.

protected conduct under Title VII's opposition clause, EEOC fails to make out a prima facie case of Title VII retaliation and KMA is entitled to summary judgment.

Accordingly, Defendant's Motion for Summary Judgment (Doc. # 121) is GRANTED.  Plaintiff's Motion for Partial Summary Judgment (Doc. # 112) is DENIED as moot.  A separate judgment will be issued.

DONE this 11th day of January, 2011.

_____/s/ W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE